# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
)
**LEWIS C. BROWN**                                )
)
                            **Plaintiff**          )
  **vs.**                                          )          **Case No. 3:01CV1967 (RNC)**
)
**EXPERIAN INFORMATION SOLUTIONS INC.**    )
)
                            **Defendant**          )
_____  )          **April 6, 2004**

## PLAINTIFF'S MOTION IN LIMINE TO DETERMINE
## ADMISSIBILITY OF FLEET'S DEPOSITION TESTIOMNY

Counsel representing Fleet Credit Card Services L.P. (FCCS) will appear on 4/07/04 to contest

the efficacy of a trial subpoena served upon its designated agent for service: CT Corporation

System (at Providence).


Concerned (in prudence) that FCCS might prevail, the plaintiff identifies the following

deposition excerpts for use at trial, (should FCCS prevail) (text attached as exhibit):


**EXCERPTS FROM FLEET 30(B)(6) DEPOSITION (SCOTT M. SMANIOTTO):**


     FCCS: Pg. 7, L. 21 – Pg. 8, L. 5         Topic: Administered Oath

FCCS: Pg. 13, L. 4 thru Pg. 16, L. 18          Topic: Docs. Reviewed / FICO Scores

FCCS: Pg. 19, L.15 thru Pg. 21, L. 4          Topic: Deponent's Position at Fleet

FCCS: Pg. 21, L.16 thru Pg. 24, L. 12          Topic: XPN Caused Credit Reduction

FCCS: Pg. 25, L.2 thru Pg. 27, L. 20          Topic: XPN Reason Codes & FICO

FCCS: Pg. 29, L. 4-15          Topic: No One w/ First-Hand Knowledge

FCCS: Pg. 36, L. 18 thru Pg. 38, L. 6          Topic: Fleet uses XPN and TU; Auto Code

FCCS: Pg. 46, L. 4-14          Topic: No Motive to Lie; Letter Reliable

FCCS: Pg. 50, L. 19-23          Topic: Bad FICO Scores

FCCS: Pg. 53, l. 16 thru Pg. 55, L. 1          Topic: XPN Caused Credit Reduction


## DOCUMENTS CITED IN TRANSCRIPTS SUPPLEMENTING JTMR EXHIBIT LIST

1.     FCCS Excel Spreadsheet (Smaniotto Deposition Exhibit #3)


Respectfully Submitted,


_____
ZENAS ZELOTES, ESQ.
*Zenas Zelotes LLC //* Shaw's Cove 5, Suite 202 // New London CT 06320
Conn. Juris No. 419408 // Fed, Bar No. 23001 Tel: (860) 442-2265 // Fax: (860) 439-0295

# EXHIBIT

1.

# ORIGINAL

### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

- - -

LEWIS C. BROWN,                 :
              Plaintiff    :
                    :
                    :
      vs.                  :
                    :
EXPERIAN INFORMATION            :
SOLUTIONS, INC.,                :    Case No.
              Defendant    :    3:01cv1967(RNC)

- - -

Philadelphia, Pennsylvania
August 27, 2002
- - -

Deposition of SCOTT M.

SMANTOTTO, held in The Consumer Law Firm of

FRANCIS & MAILMAN, P.C., Land Title Building,

19th Floor, 100 South Broad Street, at 12:15

p.m., before Susan S. Reissel, Registered

Professional Reporter.

- - -

LYN RUBENSTEIN & ASSOCIATES
1518 Walnut Street, Suite 1010
Philadelphia, PA 19102
(215) 546-0006
FAX (215) 546-9183
1-800-825-DEPS
1-877-WE DO DEPS



APPEARANCES:

        CONSUMER LAW OFFICE
        BY:   ZENAS ZELOTES, ESQUIRE
        753 Buddington Road
        Groton, CT 06340
        Attorney for Plaintiff

        JONES, DAY, REAVIS & POGUE
        BY:   GEORGE KOSTOLAMPROS, ESQUIRE
        222 East 41st Street
        New York, NY 10017-6702
        Attorney for Defendant

        BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
        BY:   JOHN SEMLER, ESQUIRE
        1735 Market Street, 51st Floor
        Philadelphia, PA 19103
        Attorney for Fleet Bank, N.A.

3

## I N D E X

SCOTT M. SMANIOTTO                          PAGE

    By Mr. Zelotes                          13

    By Mr. Kostolampros                     36

    By Mr. Zelotes                          46

## E X H I B I T S

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Smaniotto 1 | Letter dated 10/6/99 from Fleet Credit Card Services to Mr. Brown | 4 |
| Smaniotto 2 | Experian Personal Credit Report dated 11/8/01 | 4 |
| Smaniotto 3 | Data spreadsheet | 14 |
| Smaniotto 4 | Letter dated 7/31/00 from Fleet Credit Card Services to Mr. Brown | 40 |



1            THE WITNESS:  Yes.

2            MR. ZELOTES:  The court reporter

3      cannot take down nods or shakes of the

4      head; so, naturally, it will be

5      necessary to answer my questions

6      audibly.  Is that okay?

7            THE WITNESS:  Yes.

8            MR. ZELOTES:  When I begin my

9      question, you may already know

10     ultimately what question I'm going to be

11     asking and the answer to it, but perhaps

12     for the sake of clarity of the record,

13     would you agree to allow me to complete

14     my question before you answer the

15     question?

16            THE WITNESS:  Yes.

17            MR. ZELOTES:  Thank you.

18            Have you ever been deposed

19     before?

20            THE WITNESS:  No.

21            MR. ZELOTES:  You do understand

22     that you were administered an oath a

23     moment ago by the court reporter?

24            THE WITNESS:  Yes.

1          MR. ZELOTES:  You understand

2     that your deposition testimony has the

3     same weight and importance and

4     significance as if it was offered up in

5     court?

6          THE WITNESS:  Yes.

7          MR. ZELOTES:  You will do your

8     best to tell the complete truth at this

9     deposition?

10          THE WITNESS:  Yes.

11          MR. ZELOTES:  If you do not

12     understand a question that I ask, you

13     should not answer it.  Instead of

14     answering it, you should ask for

15     clarification.

16          Would you agree to do that?

17          THE WITNESS:  Certainly.

18          MR. ZELOTES:  If you do answer a

19     question, then would it be a fair

20     assumption on my part to assume that you

21     understood the question?

22          THE WITNESS:  Yes.

23          MR. ZELOTES:  Sometimes you will

24     understand my question perfectly well,

1              THE WITNESS:   No.  I'm okay.

2              MR. ZELOTES:   Fantastic.

3    BY MR. ZELOTES:

4    Q.       Mr. Smaniotto, did you review any

5    documents while you were preparing for this

6    deposition?

7    A.       We did some research into some of the

8    data that we have, yes.

9    Q.       Could you tell me generally what that

10   research entailed?

11   A.       We have archived data at the account

12   level that we interrogated to understand a time

13   series snapshot of Mr. Brown's history with

14   Fleet.

15   Q.       When you say "at the account level,"

16   what do you mean when you use that term?

17   A.       That it was specific to Mr. Brown's

18   account.

19   Q.       What can you discern reviewing an

20   archived account?

21   A.       Specifically, our database is three

22   years old; so at the point of this event, we

23   have very little data, but I did get a snapshot

24   of month-end data from July until October of the

1   year 1999 where we did the action.

2   Q.      Did you bring those documents with you?

3   A.      Yes.

4               MR. ZELOTES:  Maybe I should

5           have this marked as Exhibit Number 3.

6               (At this point, the court

7           reporter marked the exhibit as Smaniotto

8           Exhibit 3).

9               MR. SEMLER:  Off the record for

10          a second.

11              (Discussion off the record).

12              MR. ZELOTES:  Mr. Smaniotto, I'm

13          handing you what has been marked as

14          Smaniotto Exhibit Number 3.

15  BY MR. ZELOTES:

16  Q.      Could you tell me what it is that I'm

17  looking at?

18  A.      Certainly.  You are looking at a time

19  series of data from July 1999 through October

20  1999 of the following attributes.

21              The first one is Mr. Brown's

22  FICO score.  The next one is Mr. Brown's

23  behavior score.  The third one is his CPD or

24  cycles past due.  The next one is the external

1   status.   The next one is the credit line.   The

2   next one is the last statement balance.

3                     The next one is the portfolio

4   ID.   The next one is the random digit group.

5   The next one is his month on books or account

6   age, if you will.   The last is the strategy.

7   Q.       If I could just briefly go through a few

8   of these.

9                     The FICO score, what do I

10   understand the FICO score to be?

11   A.       FICO score is a predictive score created

12   by Fair, Isaac and Company that determines a

13   probability of an account going bad, which is

14   defined as three plus equals delinquent in the

15   next 24 months.

16   Q.       Is there a change between September 1999

17   and October 1999?

18   A.       Our records show a drop from 591 to 546.

19   Q.       What is the practical significance of a

20   FICO score dropping from 591 to 546 as Fleet

21   sees it?

22                     MR. SEMLER:   Object to the form.

23                     You can answer.   Go ahead.

24                     THE WITNESS:   Quite frankly, at

```
 1              that level, there is very little
 2              significance of that drop.
 3     BY MR. ZELOTES:
 4     Q.      Again, what do we call this document?
 5     A.      It's just an Excel spreadsheet that was
 6     developed as we developed our computer data
 7     resources.
 8     Q.      Is this Exhibit Number 3 a document kept
 9     in the regular course of business at Fleet?
10     A.      Like I said, we prepared this
11     specifically while interrogating the data for
12     this case.  These data elements reside as a
13     normal course of business, but this format that
14     you see was just prepared for today.
15     Q.      Just so I understand, this is a summary
16     then of business documents regularly kept in the
17     course of business at Fleet?
18     A.      That would be fair.
19     Q.      I don't recall if I just asked this
20     question; however, in reviewing Exhibit Number
21     3, can you determine whether or not Mr. Lewis C.
22     Brown's credit was, in fact, reduced?
23     A.      Yes.
24              From the September month-end
```

1           MR. SEMLER:  He graduated with a

2        B.A.  I'm not quite sure the GPA is

3        going to qualify him any more.

4           MR. ZELOTES:  That is fine.

5        It is really not too necessary.

6    MR. ZELOTES:

7    Q.      Where did you go from there?

8    A.      I took an internal position at the Bank

9    of New York over to the credit side of the

10   business and did a similar position forecasting

11   our credit losses.

12   Q.      What was your next position thereafter?

13   A.      I left that institution, as they sold

14   off the business, and started work with Fleet.

15   Q.      Just so I understand, you began work

16   with Fleet when?

17   A.      October of 1997.

18   Q.      What did you do at Fleet when you

19   started work in October of 1997?

20   A.      I was a special projects manager.

21   Q.      What were the job responsibilities of a

22   special projects manager?

23   A.      For the most part, I worked on the

24   portfolio management side of the business doing

1    special projects directed by our senior vice

2    president.

3    Q.        The job responsibilities and duties that

4    you held while performing that position, would

5    that have been of any assistance in reviewing

6    the records of Mr. Lewis C. Brown?

7    A.        Specifically, we do not review records

8    on an individual basis.  We have automated

9    systems that do such checking for us.  That

10    would have been the time where I started doing

11    the type of activity that led to my managing a

12    group that would have impacted accounts like

13    Mr. Brown's.

14    Q.        What is your present situation?

15    A.        I am a vice president of portfolio

16    management with Fleet Credit Card Services.

17    Q.        Could you tell me what your job

18    responsibilities as a vice president of

19    portfolio management with Fleet would entail?

20    A.        Certainly.  I supervise a group that has

21    two responsibilities; one, to reduce the credit

22    losses on our portfolio, and the other is to

23    increase the profitability of our portfolio, and

24    those two go hand in hand.

1    Q.      How long have you held that position?

2    A.      We have had some various

3    reorganizations, but I have been in positions

4    like that for four years.

5                    MR. ZELOTES:  I would like to

6                show you what has been marked as

7                Smaniotto Exhibit Number 1.

8    BY MR. ZELOTES:

9    Q.      Have you seen that Exhibit Number 1

10   before, Mr. Smaniotto?

11   A.      This was given to me by my legal

12   department in preparation for this deposition,

13   yes.

14   Q.      What is Exhibit Number 1?

15   A.      It is our standard letter informing a

16   cardholder of a credit line decrease.

17   Q.      Was that letter, in fact, issued by

18   Fleet?

19   A.      To the best of my knowledge, yes.

20   Q.      Is there a date on that document?

21   A.      October 6, 1999.

22   Q.      Would that have been the date that that

23   letter would have issued from Fleet?

24   A.      Yes.



1    Q.       How was that letter generated?

2    A.       It is an automated process that takes

3    data at the account level.

4              Again, once a decision has been

5    made to do a CLD, we send --

6              MR. SEMLER:  Let me object here

7         a second.

8              Describe what a "CLD" is.

9              THE WITNESS:  I'm sorry.  Credit

10        line decrease.

11             When a decision is made to

12        complete a credit line decrease on a

13        cardholder, the system generates a

14        signal to our processor known as FDR,

15        First Data Resources, and the letter

16        number is specifically designated.

17             Those inputs are fields that are

18        merged with the account record; so

19        they are actually brought from the

20        account record into the letter and then

21        shipped.

22   BY MR. ZELOTES:

23   Q.       In issuing that letter, did Fleet intend

24   to communicate to

23

1    Mr. Brown that his credit limit was being

2    reduced?

3    A.    Yes.

4    Q.    To what extent did Fleet intend to

5    communicate that Mr. Brown's credit limit was

6    being reduced to?

7    A.    Five hundred dollars.

8    Q.    Your determination that Mr. Brown's

9    credit limit has been reduced from $9,000 to

10   $500, can you determine that simply from looking

11   at the letter dated October 6, 1999?

12                 MR. SEMLER:  Object to the form.

13                 You can answer it if you can.

14                 THE WITNESS:  The letter does

15        not refer to the previous credit limit.

16        It only refers to the limit after the

17        decrease.

18   BY MR. ZELOTES:

19   Q.    However, it would be fair to say that

20   the Fleet letter does reflect a decrease in his

21   credit?

22   A.    That is correct.

23   Q.    In reviewing Exhibit Number 1, are you

24   able to determine the basis for the credit

24

1    decrease?

2    A.        It refers to specific reasons as found

3    on his credit report.

4    Q.        Did Fleet in whole or in part base its

5    decision upon information it received from a

6    credit report produced by Experian?

7    A.        According to the letter, that would be

8    the case, yes.

9    Q.        Do you have any reason to believe that

10   the statements made in that letter are

11   inaccurate?

12   A.        No, not at all.

13   Q.        In reviewing that letter, what was it in

14   the Experian credit report that warranted in

15   whole or in part the reduction in Mr. Brown's

16   credit?

17              MR. SEMLER:  Object to the form.

18              You can answer.

19              MR. ZELOTES:  Maybe I will

20         rephrase the question.

21              MR. SEMLER:  My problem with the

22         question is you are assuming that Fleet

23         had a copy of the credit report.  That

24         may or may not necessarily be true.

```
 1   BY MR. ZELOTES:

 2   Q.       Did Fleet receive a copy of Mr. Brown's

 3   credit report?

 4   A.       In our normal course of action, we do

 5   not obtain full credit reports on each of our

 6   cardholders.

 7   Q.       When you say "we do not obtain full

 8   credit reports," what do you obtain?

 9   A.       We primarily base our decision upon the

10   FICO score.

11   Q.       Do you see a paragraph that starts with

12   "Serious delinquency" and ends with "on

13   revolving"?

14   A.       Yes.

15   Q.       Based upon the FICO score, would you be

16   able to determine that information?

17   A.       That is also provided by Experian.

18   Q.       Again, I just want to understand.

19   A.       Certainly.

20   Q.       The paragraph beginning "Serious

21   delinquency" and ending "on revolving," the

22   paragraph four lines in depth, was that

23   information provided to Fleet from Experian?

24   A.       Yes.
```

1    Q.       How do you know that?

2    A.       In our normal course of business, when

3    we receive the FICO score, we also receive the

4    reason codes that are associated with that

5    score, and those codes are the top four reasons

6    for the generation of said score.

7    Q.       What are we calling these again?  The

8    generated words that you mentioned, how do you

9    refer to these?

10   A.       We would call them reason codes.

11   Q.       Prior to the reduction in credit, would

12   anyone at Fleet have reviewed the reason codes?

13   A.       Not specifically.

14   Q.       Would anyone at Fleet have reviewed the

15   FICO score?

16   A.       Systematically, yes.

17   Q.       When you say "not specifically," is it

18   always the case that the reason codes are not

19   reviewed or are they reviewed sometimes and not

20   others?

21   A.       We do not base our decisions upon the

22   reason codes.  It is the aggregate level of the

23   score that we base our decisions upon.

24   Q.       If I understand then, your decision to

1    reduce Mr. Brown's credit was based exclusively

2    on the FICO score?

3    A.        That is correct.

4                    MR. SEMLER:  Object to the form.

5                    THE WITNESS:  Sorry.

6                    MR. ZELOTES:  Then I will

7            rephrase the question.

8    BY MR. ZELOTES:

9    Q.        Was there one single reason why

10   Mr. Brown's credit was reduced?

11   A.        I would say the majority of that

12   decision lies within the FICO score.

13   Q.        Who provided the FICO score to Fleet?

14   A.        Per the letter, I would say Experian.

15   Q.        Does Fleet generate its own FICO scores?

16   A.        No.

17   Q.        Does Fleet rely upon credit reporting

18   agencies such as Experian to provide it with

19   FICO scores?

20   A.        That is correct.

21                   MR. ZELOTES:  I would like to

22           show you what has been marked as

23           Smaniotto Exhibit Number 2, a credit

24           report dated November 8, 2001, of Lewis

1                    THE WITNESS:    A loan officer may

2            be more opt to something like that.

3    BY MR. ZELOTES:

4    Q.        Would anyone at Fleet have more

5    information about the decision to reduce

6    Mr. Brown's credit from 9,000 to 500 than

7    yourself?

8    A.        In regard to what?

9    Q.        In other words, are you aware of any

10   person within Fleet who has firsthand knowledge

11   of the decision to reduce Mr. Brown's credit

12   from 9,000 to 500?

13   A.        No; there would be no one that would

14   have firsthand knowledge, because these

15   decisions are made on a systematic basis.

16                    MR. ZELOTES:    We are almost

17            done.    I promised it would be brief.

18                    MR. KOSTOLAMPROS:    I have a few

19            questions.

20                    MR. ZELOTES:    Of course.

21                    I only get one shot at asking a

22            few questions.

23   BY MR. ZELOTES:

24   Q.        I am referring to Exhibit Number 3



```
 1   is posted to our records.
 2   Q.        The Account Number 5491000705798929, was
 3   that account associated with the name Lewis C.
 4   Brown?
 5   A.        As far as our records indicate.
 6   Q.        Was the aforementioned account number
 7   associated with Social Security Number
 8   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?
 9   A.        Again, as far as our records indicate.
10   Q.        The "PID," is that an internal number?
11   A.        That is correct.
12                   MR. ZELOTES:  I have no further
13             questions.  Thank you.
14                   MR. KOSTOLAMPROS:
15             Mr. Smaniotto, my name is George
16             Kostolampros.
17   BY MR. KOSTOLAMPROS:
18   Q.        At one point, you said you assumed that
19   Fleet relied on Experian based on the letter,
20   Exhibit 1.
21                   Do you know whether they
22   actually did rely on Experian's FICO score or on
23   any other credit reporting FICO score?
24   A.        At this time, we were obtaining data
```



LYN RUBENSTEIN & ASSOCIATES · (215) 546-0006

1   from multiple credit bureaus, including

2   TransUnion and Experian; so I relied on the

3   letter to say that it was actually Experian's.

4   Q.       Is that anywhere in your records that

5   you did review what company you actually relied

6   on?

7   A.       Unfortunately, at this point in time,

8   the account has purged off of our system of

9   record.

10   Q.       You cannot say specifically whether

11   Fleet relied on an Experian report or a

12   TransUnion report?

13                   MR. SEMLER:  Object to the form.

14                   Other than the information

15           provided in the letter?

16                   MR. KOSTOLAMPROS:  Other than

17           the letter.

18   BY MR. KOSTOLAMPROS:

19   Q.       You are basically relying on that letter

20   to answer that question?

21   A.       That is correct.

22   Q.       Nothing in your own personal knowledge

23   or in your research in preparing for today?

24   A.       No; other than just how the system

1    works.

2                   The accounts, when we get the

3    account review information in, are tagged with a

4    code that either means Experian or TransUnion.

5    Then when the letters are generated, it pulls

6    from the code which bureau was used.

7    Q.        Back to Exhibit No. 3.  I just was a

8    little confused as to on September 1999 whether

9    the FICO score remained the same.

10                  What is the "Port ID" again?

11   A.        The Portfolio ID.  Again, that is a

12   segmentation that we use to divide up accounts

13   into different groups.

14   Q.        It seemed to me that you were saying it

15   was reviewed in September 1999, the whole

16   account, and you came up with a new portfolio

17   score, but the FICO score remained the same.

18                  At this time, was the FICO score

19   the same?  I'm just a little confused there, if

20   you could elaborate more on that.

21   A.        Certainly.  Again, if you recall, on

22   earlier questions, that this account was

23   purchased from household and that the conversion

24   was completed in April of 1999 or at least it

1            MR. ZELOTES: I just want to

2        just ask a few follow-up questions.

3   BY MR. ZELOTES:

4   Q.        Do you have any reason to believe that

5   Fleet would list Experian as the source of the

6   FICO score if, in fact, it obtained that

7   information from TransUnion?

8   A.        There would be no reason to do that.

9   Q.        Are you aware of any instances where

10  Fleet has listed Experian as the source of a

11  FICO score in this or in any other report when,

12  in fact, the FICO score came from another credit

13  reporting agency such as TransUnion?

14  A.        Not to my knowledge.

15  Q.        If I could again refer you to Smaniotto

16  Exhibit Number 1, the Fleet letter dated October

17  6.              Do you know how soon that letter

18  would have issued after the determination

19  therein reflected?

20  A.        Generically speaking, the credit line

21  decreases, according to our processor, FDR,

22  they basically occur in the middle of the night;

23  so this would go out the following day of that.

24              If it occurred at 1 o'clock in

1            are you referring to?

2                    MR. ZELOTES:  FICO score of 546.

3                    THE WITNESS:  From that

4            research, we can say that it posted to

5            the account record sometime after

6            September month end and sometime before

7            account month end.

8     BY MR. ZELOTES:

9     Q.      Based upon Exhibit Number 1, would it be

10    fair to say then that Fleet obtained the FICO

11    score sometime between October 1st and October

12    6th?

13                    MR. SEMLER:  Object to the form.

14                    THE WITNESS:  It would be

15            supposition; because even at the

16            September month-end level, we would have

17            taken similar action.

18    BY MR. ZELOTES:

19    Q.      Is 591 a high-risk FICO score?

20    A.      Yes.

21    Q.      Is 546 a higher-risk FICO score?

22    A.      Yes.

23    Q.      Are you aware to what extent Mr. Brown's

24    credit limit would have been reduced had the



1          object.  He has already answered that
2          question.  I ask that he not answer it
3          again.
4                   MR. ZELOTES:  You are
5          instructing him not to answer it?
6                   MR. SEMLER:  He has already
7          answered that.  You already asked him.
8          He is going to say "yes."
9                   MR. ZELOTES:  Let him say "yes."
10                  MR. SEMLER:  We are not going to
11         ask him every question two or three
12         times.
13                  Has your answer changed?
14                  THE WITNESS:  No.
15  BY MR. ZELOTES:
16  Q.      Why was Mr. Brown's credit limit reduced
17  to 500 as opposed to 1,000?
18  A.      The decrease strategy that we have is to
19  reduce the limit down to a proportion of the
20  balance.  With a zero balance, we put a $500
21  limit on that reduction.
22  Q.      591, from where would have gotten that
23  number?
24                  MR. SEMLER:  Objection.  Asked



1            and answered.

2                    Do not answer it again.

3                    THE WITNESS:  A credit bureau

4            agency.

5    BY MR. ZELOTES:

6    Q.      May one of those credit card reporting

7    agencies be Experian?

8    A.      Yes.

9    Q.      We do not know which credit reporting

10   agency issued the 591 score?

11                   MR. SEMLER:  Object to the form.

12           He has already been asked and answered

13           that question.

14                   MR. ZELOTES:  Go ahead.

15                   MR. SEMLER:  You can answer it

16           again.

17                   THE WITNESS:  I cannot

18           definitively say whether the 591 or the

19           546 was used in this decision based upon

20           the timing of the records that I show

21           here.

22                   All I can say is the decision,

23           whichever score it was based upon, was

24           the Experian score as evidenced in the



LYN RUBENSTEIN & ASSOCIATES · (215) 546-0006

1          letter.

2    BY MR. ZELOTES:

3    Q.          Let's go back to July 1999, there is a

4    591 score there.  Fleet does not know which

5    credit reporting agency provided that FICO

6    score?

7    A.          I do not know that.  I cannot speak for

8    the entire organization of Fleet.

9    Q.          Are you aware of any person who would be

10   able to determine that information?

11   A.          It is possible.  As I said, my

12   responsibilities do not include a liaison with

13   the bureaus.  That is not my job function.

14   Q.          Who would be able to testify as to the

15   source of the July 1999 FICO score of 591?

16             MR. SEMLER:  If you know.

17             THE WITNESS:  There may be

18        individuals in the institution.  I would

19        - -

20             MR. SEMLER:  If you know.

21             THE WITNESS:  Marcia --

22             MR. SEMLER:  Is there any

23        relevance to the July 1999 FICO score?

24             MR. ZELOTES:  I think there is,

*Zenas Zelotes* LLC
Shaw's Cove 5, Suite 202
Tel. (860) 442-2265 / Fax. (860) 439-0295

COMMERCIAL LITIGATION & PLANNING

Jones, Day, Reavis & Pogue
Attn: Arun Chandra
222 East 41st Street
New York, NY 10017-6702      4/6/04

*Zenas Zelotes* LLC
Shaw's Cove 5, Suite 202
Tel. (860) 442-2265 / Fax. (860) 439-0295

COMMERCIAL LITIGATION & PLANNING

United States District Court
Attn: Clerk of Court
450 Main Street
Hartford CT 06103              4/6/04

---

**CERTIFICATE OF SERVICE**

The undersigned counsel certifies that a copy of the document(s) attached was served upon each addressee by USPS first class mail on the date(s) reflected.

4/6/2004

_____

ZENAS ZELOTES, ESQ.
*Zenas Zelotes LLC*
Shaw's Cove 5, Suite 202
New London CT 06320
Conn. Juris No. 419408 // Fed. Bar No. 23001
Tel: (860) 442-2265 // Fax: (860) 439-0295

---

*Zenas Zelotes* LLC
Shaw's Cove 5, Suite 202
Tel. (860) 442-2265 / Fax. (860) 439-0295

COMMERCIAL LITIGATION & PLANNING

United States District Court
Attn: Chambers (Chatigny J.) (C. Copy)
450 Main Street
Hartford CT 06103              4/6/04