## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LEWIS C. BROWN )<br><br>Plaintiff )<br><br>vs. )<br><br>EXPERIAN INFORMATION SOLUTIONS INC. )<br><br>Defendant ) | Case No. 3:01CV1967 (RNC)<br><br><br><br>April 13, 2004 |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE TO
## DETERMINE ADMISSIBILITY OF FLEET'S DEPOSITION TESTIOMNY

The plaintiff, pursuant to Fed.R.Civ.P. 32(a)(3), subsections (B) (D) and (E), asks that the court

permit him to introduce the deposition testimony of Scott Smaniotto.

STATEMENT OF APPLICABLE FACT

On October 6, 1999. Fleet Credit Card Services L.P. (FCCS) mailed a letter to the

plaintiff informing him that it was reducing his line of credit, in whole or in part, upon a

derogatory Experian credit report (Exhibit A). FCCS has its principal place of business in

Horsham PA. (Exhibit C)

1

On August 22, 2002, both plaintiff and defense counsel deposed FCCS by and through its designated representative, Scott Smaniotto, vice president of FCCS portfolio management (Exhibit B, Pg. 1). The subpoena instructed the deponent to make such persons available as might authenticate and affirm the truth of the assertions appearing in the (appended) October 6 letter. (Exhibit D).

Mr. Smaniotto identified the October 6 letter as a standard, automated form letter informing a cardholder of a credit line decrease (Exhibit B. Pg. 21-22). Mr. Smaniotto testified that when FCCS does an account review, its accounts are automatically tagged with a code that either means Experian or TransUnion. (Exhibit B, Pg. 38).

Mr. Smaniotto testified that he has no reason to believe that the statement attributing its decision to a derogatory Experian credit report are inaccurate (Exhibit B, Pg. 24). Mr. Smaniotto testified Fleet would have no reason to list Experian as the source of its credit information if it (in fact) obtained its information from TransUnion (Exhibit B, Pg. 46). Mr. Smaniotto further noted that no person at FCCS would have first-hand knowledge of the statements therein (Exhibit B, Pg. 29). Finally, Mr. Smaniotto testified its applicable records had since been purged from the system (Exhibit B, Pg. 37). The FCCS custodian of records further noted that Fleet does not maintain records of its credit reports in the regular course of its business. (Exhibit E).

FCCS refuses to voluntarily furnish Mr. Smaniotto at trial. (Exhibit C)

Experian refuses to stipulate to his being outside of the subpoena power. (Exhibit C)

Mr. Smaniotto resides in Maryland and works in Horsham PA. (Exhibit C)

Upon learning that Experian refused to stipulate to his unavailability (and the use of his

2

deposition at trial). Plaintiff served a subpoena directly upon FCCS' registered agent for service, attempting (in good faith) to exhaust all possible remedies.  On 4/13/04, this court (Martinez, J.) granted FCCS' motion to quash, citing an inability to serve a Rule 45 subpoena on a corporate entity.

Reduced to its essence: Experian aims to prevent the plaintiff from introducing ANY evidence of the October 6 (FICO format) credit report Experian furnished to Fleet (a procedural "home run" calculated to prevent the plaintiff from sustaining a prima facie case).

The plaintiff **vehemently** objects.

ADMISSIBILITY PURSUANT TO Fed.R.Civ.P. 32(a)(3)(B)

Fed.R.Civ.P. 32(a)(3)(B) provides that:

> The deposition of a witness ... may be used by any party for any purpose if the court finds
> that the witness is at a distance greater than 100 miles from the place of trial or hearing ...
> unless it appears that the absence of the witness was procured by the party offering the
> deposition.

The plaintiff is not responsible for Mr. Smaniotto's absence.  Plaintiff's counsel contacted counsel to FCCS after which said counsel refused to voluntarily produce him.  (Exhibit C) Plaintiff could not serve a subpoena upon Mr. Smaniotto (individually) as he is clearly outside

3

the 100-mile radius. (Exhibit C) The plaintiff nonetheless (in good faith) endeavored to compel his attendance by way of a subpoena served directly upon FCCS' registered agent for service, CT Corporation System. (Exhibit C) On 4/13/04, this court held that, unlike a Rule 30 deposition, a Rule 45 trial subpoena cannot be served upon a corporation, but rather must be served on an individual. As previously established, effective service upon Mr. Smaniotto is impossible.

Fed.R.Civ.P. 32(a)(3) permits the introduction of Mr. Smaniotto's depsotion testimony.

ADMISSIBILITY PURSUANT TO Fed.R.Civ.P. 32(a)(3)(D)

Fed.R.Civ.P. 32(a)(3)(D) provides that:

> The deposition of a witness ... may be used by any party for any purpose if the court finds: that the party offering the deposition has been unable to procure the witness by subpoena."

Fed.R.Civ.P. 32(a)(3)(D) is (at least in theory) an alternative means of introducing Mr. Smaniotto's testimony.

I say "in theory" because Fed.R.Civ.P. 32(a)(3)(D) is logically addressed to service of a subpoena directed to a person *within* 100 miles (which is not the case at bar).

4

This notwithstanding, some comments: Introducing testimony via Fed.R.Civ.P. 32(a)(3)(D) does *not* require that the party seeking to introduce the testimony demonstrate that service of an effective subpoena is *objectively impossible*. Rather, this subsection simply requires that the party seeking to introduce the testimony demonstrate that he or she reasonably endeavored in good faith if service is reasonably foreseeable. This construction is evident from the choice of words selected in its drafting ("has been unable" as opposed to "is unable").

Plaintiff attempted service of his subpoena upon FCCS and failed. Plaintiff can not reasonably attempt service directly upon Mr. Smaniotto because he it outside of 100 miles.

Fed.R.Civ.P. 32(a)(3) would permit the introduction of Mr. Smaniotto's testimony.

ADMISSIBILITY PURSUANT TO Fed.R.Civ.P. 32(a)(3)(E)

Fed.R.Civ.P. 32(a)(3)(E) provides that:

The deposition of a witness ... may be used by any party for any purpose if the court finds:

upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the

5

testimony of witnesses orally in open court, to allow the deposition to be used.

In the alternative, circumstance at present instance is both exceptional and the interest of justice. The defendant aims to prevent the plaintiff from introducing the seminal October 6 document *upon which this entire action is predicated.* Whether this October 6 document comes in as substantive evidence of the matter asserted (without supporting testimony) under FRE 807 or FRE 803(15) is a matter separately briefed (and before Judge Chatigny). If Mr. Smaniotto's testimony comes in, the court might not need decide these issues (deeming Mr. Smaniotto's testimony sufficient to avoid a hearsay challenge). Avoiding a hearsay challenge was the plaintiff's *sole purpose* in traveling to Philadelphia. It is what the testimony identified speaks to.

Wherefore the plaintiff repeats his prayer that this court timely authorize the introduction of Mr. Smaniotto's deposition testimony, in accord with the provisions Fed.R.Civ.P. 32(a)(3).

Respectfully Submitted,

ZENAS ZELOTES, ESQ.
*Zenas Zelotes LLC* // Shaw's Cove 5, Suite 202 // New London CT 06320
Conn. Juris No. 419408 // Fed. Bar No. 23001 Tel: (860) 442-2265 // Fax: (860) 439-0295

# EXHIBIT A

**Fleet**          FLEET CREDIT CARD SERVICES
                   P.O. BOX 15810
                   WILMINGTON, DE 19886-5810

October 6, 1999

LEWIS C BROWN
PO BOX 286
ROWAYTON CT 06853-0286

IIhnlIhhddddhIIdIhnddhdddhhddIIdhhl

RE: 5491 0007 0579 8929

Dear Lewis C Brown,

At Fleet Bank, we make every attempt to meet our customers' credit needs. However, based upon a recent review of your financial profile, we have decided to decrease your credit limit to $500 effectively immediately.

Our decision was based in whole or in part on the following information contained in the your credit bureau report:

SERIOUS DELINQUENCY, DEROGATORY PUBLIC RECORD, OR COLLECTION
AMOUNT PAST DUE ON ACCOUNTS
TIME SINCE DELINQUENCY TOO RECENT OR UNKNOWN
TOTAL BALANCES TO CREDIT LINES IS TOO HIGH ON REVOLVING

You may contact the credit bureau directly at:

EXPERIAN
701 EXPERIAN PARKWAY
PO BOX 2002
ALLEN, TX  75013-0036
888-397-3742

The reporting agency played no part in these changes and cannot supply specific reasons for such. You have a right to a free copy of your report from the credit reporting agency listed above if you request such information within 60 days of receiving this notice. If information in your report is inaccurate or incomplete, you may dispute the matter with the reporting agency.

Please note that the terms and conditions specified in your Cardholder Agreement still apply to your account.

Should you have any questions concerning this matter, please call us at this toll-free 1-800-882-2735.

Sincerely,

Fleet Credit Card Service

---

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.  The federal agency that administers compliance with this law concerning this creditor is The Office of the Comptroller of the Currency.Customer Assistance Unit, 1301 McKinney Ave., Suite 3710, Houston, Texas 77010.

# EXHIBIT B

1

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

- - -

LEWIS C. BROWN,                   :
               Plaintiff          :
                                  :
                                  :
     vs.                          :
                                  :
EXPERIAN INFORMATION              :
SOLUTIONS, INC.,                  :    Case No.
               Defendant          :    3:01cv1967(RNC)


Philadelphia, Pennsylvania
August 27, 2002
- - -


Deposition of SCOTT M.

SMANIOTTO, held in The Consumer Law Firm of

FRANCIS & MAILMAN, P.C., Land Title Building,

19th Floor, 100 South Broad Street, at 12:15

p.m., before Susan S. Beissel, Registered

Professional Reporter.



- - -


LYN RUBENSTEIN & ASSOCIATES
1518 Walnut Street, Suite 1010
Philadelphia, PA 19102
(215) 546-0006
FAX (215) 546-9183
1-800-825-DEPS
1-877-WE DO DEPS

 LYN RUBENSTEIN & ASSOCIATES  ·  (215) 546-0006

7

1          THE WITNESS:  Yes.

2          MR. ZELOTES:  The court reporter

3    cannot take down nods or shakes of the

4    head; so, naturally, it will be

5    necessary to answer my questions

6    audibly.  Is that okay?

7          THE WITNESS:  Yes.

8          MR. ZELOTES:  When I begin my

9    question, you may already know

10   ultimately what question I'm going to be

11   asking and the answer to it, but perhaps

12   for the sake of clarity of the record,

13   would you agree to allow me to complete

14   my question before you answer the

15   question?

16         THE WITNESS:  Yes.

17         MR. ZELOTES:  Thank you.

18         Have you ever been deposed

19   before?

20         THE WITNESS:  No.

21         MR. ZELOTES:  You do understand

22   that you were administered an oath a

23   moment ago by the court reporter?

24         THE WITNESS:  Yes.

8

1          MR. ZELOTES:  You understand

2    that your deposition testimony has the

3    same weight and importance and

4    significance as if it was offered up in

5    court?

6          THE WITNESS:  Yes.

7          MR. ZELOTES:  You will do your

8    best to tell the complete truth at this

9    deposition?

10          THE WITNESS:  Yes.

11          MR. ZELOTES:  If you do not

12    understand a question that I ask, you

13    should not answer it.  Instead of

14    answering it, you should ask for

15    clarification.

16          Would you agree to do that?

17          THE WITNESS:  Certainly.

18          MR. ZELOTES:  If you do answer a

19    question, then would it be a fair

20    assumption on my part to assume that you

21    understood the question?

22          THE WITNESS:  Yes.

23          MR. ZELOTES:  Sometimes you will

24    understand my question perfectly well,

13

| | |
|---|---|
| 1 | THE WITNESS: No. I'm okay. |
| 2 | MR. ZELOTES: Fantastic. |
| 3 | BY MR. ZELOTES: |
| 4 | Q.    Mr. Smaniotto, did you review any |
| 5 | documents while you were preparing for this |
| 6 | deposition? |
| 7 | A.    We did some research into some of the |
| 8 | data that we have, yes. |
| 9 | Q.    Could you tell me generally what that |
| 10 | research entailed? |
| 11 | A.    We have archived data at the account |
| 12 | level that we interrogated to understand a time |
| 13 | series snapshot of Mr. Brown's history with |
| 14 | Fleet. |
| 15 | Q.    When you say "at the account level," |
| 16 | what do you mean when you use that term? |
| 17 | A.    That it was specific to Mr. Brown's |
| 18 | account. |
| 19 | Q.    What can you discern reviewing an |
| 20 | archived account? |
| 21 | A.    Specifically, our database is three |
| 22 | years old; so at the point of this event, we |
| 23 | have very little data, but I did get a snapshot |
| 24 | of month-end data from July until October of the |

1    year 1999 where we did the action.

2    Q.        Did you bring those documents with you?

3    A.        Yes.

4              MR. ZELOTES:   Maybe i should

5         have this marked as Exhibit Number 3.

6              (At this point, the court

7         reporter marked the exhibit as Smaniotto

8         Exhibit 3).

9              MR. SEMLER:   Off the record for

10        a second.

11             (Discussion off the record).

12             MR. ZELOTES:   Mr. Smaniotto, I'm

13        handing you what has been marked as

14        Smaniotto Exhibit Number 3.

15   BY MR. ZELOTES:

16   Q.        Could you tell me what it is that I'm

17   looking at?

18   A.        Certainly.  You are looking at a time

19   series of data from July 1999 through October

20   1999 of the following attributes.

21             The first one is Mr. Brown's

22   FICO score.  The next one is Mr. Brown's

23   behavior score.  The third one is his CPD or

24   cycles past due.  The next one is the external



15

1    status.   The next one is the credit line.   The

2    next one is the last statement balance.

3                      The next one is the portfolio

4    ID.   The next one is the random digit group.

5    The next one is his month on books or account

6    age, if you will.   The last is the strategy.

7    Q.       If I could just briefly go through a few

8    of these.

9                      The FICO score, what do I

10   understand the FICO score to be?

11   A.       FICO score is a predictive score created

12   by Fair, Isaac and Company that determines a

13   probability of an account going bad, which is

14   defined as three plus equals delinquent in the

15   next 24 months.

16   Q.       Is there a change between September 1999

17   and October 1999?

18   A.       Our records show a drop from 591 to 546.

19   Q.       What is the practical significance of a

20   FICO score dropping from 591 to 546 as Fleet

21   sees it?

22                      MR. SEMLER:   Object to the form.

23                      You can answer.   Go ahead.

24                      THE WITNESS:   Quite frankly, at

19

```
 1                    MR. SEMLER:  He graduated with a
 2          B.A.  I'm not quite sure the GPA is
 3          going to qualify him any more.
 4                    MR. ZELOTES:  That is fine.
 5          It is really not too necessary.
 6   MR. ZELOTES:
 7   Q.        Where did you go from there?
 8   A.        I took an internal position at the Bank
 9   of New York over to the credit side of the
10   business and did a similar position forecasting
11   our credit losses.
12   Q.        What was your next position thereafter?
13   A.        I left that institution, as they sold
14   off the business, and started work with Fleet.
15   Q.        Just so I understand, you began work
16   with Fleet when?
17   A.        October of 1997.
18   Q.        What did you do at Fleet when you
19   started work in October of 1997?
20   A.        I was a special projects manager.
21   Q.        What were the job responsibilities of a
22   special projects manager?
23   A.        For the most part, I worked on the
24   portfolio management side of the business doing
```

1   special projects directed by our senior vice

2   president.

3   Q.      The job responsibilities and duties that

4   you held while performing that position, would

5   that have been of any assistance in reviewing

6   the records of Mr. Lewis C. Brown?

7   A.      Specifically, we do not review records

8   on an individual basis.  We have automated

9   systems that do such checking for us.  That

10  would have been the time where I started doing

11  the type of activity that led to my managing a

12  group that would have impacted accounts like

13  Mr. Brown's.

14  Q.      What is your present situation?

15  A.      I am a vice president of portfolio

16  management with Fleet Credit Card Services.

17  Q.      Could you tell me what your job

18  responsibilities as a vice president of

19  portfolio management with Fleet would entail?

20  A.      Certainly.  I supervise a group that has

21  two responsibilities; one, to reduce the credit

22  losses on our portfolio, and the other is to

23  increase the profitability of our portfolio, and

24  those two go hand in hand.

21

```
1    Q.         How long have you held that position?

2    A.         We have had some various

3    reorganizations, but 1 have been in positions

4    like that for four years.

5                     MR. ZELOTES:  I would like to

6              show you what has been marked as

7              Smaniotto Exhibit Number 1.

8    BY MR. ZELOTES:

9    Q.         Have you seen that Exhibit Number 1

10   before, Mr. Smaniotto?

11   A.         This was given to me by my legal

12   department in preparation for this deposition,

13   yes.

14   Q.         What is Exhibit Number 1?

15   A.         It is our standard letter informing a

16   cardholder of a credit line decrease.

17   Q.         Was that letter, in fact, issued by

18   Fleet?

19   A.         To the best of my knowledge, yes.

20   Q.         Is there a date on that document?

21   A.         October 6, 1999.

22   Q.         Would that have been the date that that

23   letter would have issued from Fleet?

24   A.         Yes.
```

22

Q.      How was that letter generated?

A.      It is an automated process that takes
data at the account level.

        Again, once a decision has been
made to do a CLD, we send --

        MR. SEMLER:  Let me object here
        a second.

        Describe what a "CLD" is.

        THE WITNESS:  I'm sorry.  Credit
        line decrease.

        When a decision is made to
        complete a credit line decrease on a
        cardholder, the system generates a
        signal to our processor known as FDR,
        First Data Resources, and the letter
        number is specifically designated.

        These inputs are fields that are
        merged with the account record; so
        they are actually brought from the
        account record into the letter and then
        shipped.

BY MR. ZELOTES:

Q.      In issuing that letter, did Fleet intend
to communicate to

23

1  Mr. Brown that his credit limit was being

2  reduced?

3  A.      Yes.

4  Q.      To what extent did Fleet intend to

5  communicate that Mr. Brown's credit limit was

6  being reduced to?

7  A.      Five hundred dollars.

8  Q.      Your determination that Mr. Brown's

9  credit limit has been reduced from $9,000 to

10  $500, can you determine that simply from looking

11  at the letter dated October 6, 1999?

12           MR. SEMLER:   Object to the form.

13           You can answer it if you can.

14           THE WITNESS:   The letter does

15       not refer to the previous credit limit.

16       It only refers to the limit after the

17       decrease.

18  BY MR. ZELOTES:

19  Q.      However, it would be fair to say that

20  the Fleet letter does reflect a decrease in his

21  credit?

22  A.      That is correct.

23  Q.      In reviewing Exhibit Number 1, are you

24  able to determine the basis for the credit

24

1  decrease?

2  A.      It refers to specific reasons as found

3  on his credit report.

4  Q.      Did Fleet in whole or in part base its

5  decision upon information it received from a

6  credit report produced by Experian?

7  A.      According to the letter, that would be

8  the case, yes.

9  Q.      Do you have any reason to believe that

10  the statements made in that letter are

11  inaccurate?

12  A.      No, not at all.

13  Q.      In reviewing that letter, what was it in

14  the Experian credit report that warranted in

15  whole or in part the reduction in Mr. Brown's

16  credit?

17          MR. SEMLER:  Object to the form.

18          You can answer.

19          MR. ZELOTES:  Maybe I will

20      rephrase the question.

21          MR. SEMLER:  My problem with the

22      question is you are assuming that Fleet

23      had a copy of the credit report.  That

24      may or may not necessarily be true.

25

BY MR. ZELOTES:

Q.       Did Fleet receive a copy of Mr. Brown's credit report?

A.       In our normal course of action, we do not obtain full credit reports on each of our cardholders.

Q.       When you say "we do not obtain full credit reports," what do you obtain?

A.       We primarily base our decision upon the FICO score.

Q.       Do you see a paragraph that starts with "Serious delinquency" and ends with "on revolving"?

A.       Yes.

Q.       Based upon the FICO score, would you be able to determine that information?

A.       That is also provided by Experian.

Q.       Again, I just want to understand.

A.       Certainly.

Q.       The paragraph beginning "Serious delinquency" and ending "on revolving," the paragraph four lines in depth, was that information provided to Fleet from Experian?

A.       Yes.

1    Q.        How do you know that?

2    A.        In our normal course of business, when

3    we receive the FICO score, we also receive the

4    reason codes that are associated with that

5    score, and those codes are the top four reasons

6    for the generation of said score.

7    Q.        What are we calling these again?  The

8    generated words that you mentioned, how do you

9    refer to these?

10   A.        We would call them reason codes.

11   Q.        Prior to the reduction in credit, would

12   anyone at Fleet have reviewed the reason codes?

13   A.        Not specifically.

14   Q.        Would anyone at Fleet have reviewed the

15   FICO score?

16   A.        Systematically, yes.

17   Q.        When you say "not specifically," is it

18   always the case that the reason codes are not

19   reviewed or are they reviewed sometimes and not

20   others?

21   A.        We do not base our decisions upon the

22   reason codes.  It is the aggregate level of the

23   score that we base our decisions upon.

24   Q.        If I understand then, your decision to

27

reduce Mr. Brown's credit was based exclusively

on the FICO score?

A.      That is correct.

                MR. SEMLER:  Object to the form.

                THE WITNESS:  Sorry.

                MR. ZELOTES:  Then I will

        rephrase the question.

BY MR. ZELOTES:

Q.      Was there one single reason why

Mr. Brown's credit was reduced?

A.      I would say the majority of that

decision lies within the FICO score.

Q.      Who provided the FICO score to Fleet?

A.      Per the letter, I would say Experian.

Q.      Does Fleet generate its own FICO scores?

A.      No.

Q.      Does Fleet rely upon credit reporting

agencies such as Experian to provide it with

FICO scores?

A.      That is correct.

                MR. ZELOTES:  I would like to

        show you what has been marked as

        Smaniotto Exhibit Number 2, a credit

        report dated November 8, 2001, of Lewis

1                  THE WITNESS:  A loan officer may

2          be more opt to something like that.

3    BY MR. ZELOTES:

4    Q.      Would anyone at Fleet have more

5    information about the decision to reduce

6    Mr. Brown's credit from 9,000 to 500 than

7    yourself?

8    A.       In regard to what?

9    Q.       In other words, are you aware of any

10   person within Fleet who has firsthand knowledge

11   of the decision to reduce Mr. Brown's credit

12   from 9,000 to 500?

13   A.      No; there would be no one that would

14   have firsthand knowledge, because these

15   decisions are made on a systematic basis.

16                  MR. ZELOTES:  We are almost

17          done.  I promised it would be brief.

18                  MR. KOSTOLAMPROS:  I have a few

19          questions.

20                  MR. ZELOTES:  Of course.

21          I only get one shot at asking a

22          few questions.

23   BY MR. ZELOTES:

24   Q.       I am referring to Exhibit Number 3

is posted to our records.

Q.       The Account Number 5491000705798929, was
that account associated with the name Lewis C.
Brown?

A.       As far as our records indicate.

Q.       Was the aforementioned account number
associated with Social Security Number
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?

A.       Again, as far as our records indicate.

Q.       The "PID," is that an internal number?

A.       That is correct.

                MR. ZELOTES:   I have no further
        questions.   Thank you.

                MR. KOSTOLAMPROS:

        Mr. Smaniotto, my name is George
        Kostolampros.

BY MR. KOSTOLAMPROS:

Q.       At one point, you said you assumed that
Fleet relied on Experian based on the letter,
Exhibit 1.

                Do you know whether they
actually did rely on Experian's FICO score or on
any other credit reporting FICO score?

A.       At this time, we were obtaining data

 **LYN RUBENSTEIN & ASSOCIATES · (215) 546-0006**

1    from multiple credit bureaus, including

2    TransUnion and Experian; so I relied on the

3    letter to say that it was actually Experian's.

4    Q.        Is that anywhere in your records that

5    you did review what company you actually relied

6    on?

7    A.        Unfortunately, at this point in time,

8    the account has purged off of our system of

9    record.

10   Q.        You cannot say specifically whether

11   Fleet relied on an Experian report or a

12   TransUnion report?

13                    MR. SEMLER:  Object to the form.

14                    Other than the information

15           provided in the letter?

16                    MR. KOSTOLAMPROS:  Other than

17           the letter.

18   BY MR. KOSTOLAMPROS:

19   Q.        You are basically relying on that letter

20   to answer that question?

21   A.        That is correct.

22   Q.        Nothing in your own personal knowledge

23   or in your research in preparing for today?

24   A.        No; other than just how the system

28

1    works.

2                    The accounts, when we get the

3    account review information in, are tagged with a

4    code that either means Experian or TransUnion.

5    Then when the letters are generated, it pulls

6    from the code which bureau was used.

7    Q.      Back to Exhibit No. 3.  I just was a

8    little confused as to on September 1999 whether

9    the FICO score remained the same.

10                   What is the "Port ID" again?

11   A.      The Portfolio ID.  Again, that is a

12   segmentation that we use to divide up accounts

13   into different groups.

14   Q.      It seemed to me that you were saying it

15   was reviewed in September 1999, the whole

16   account, and you came up with a new portfolio

17   score, but the FICO score remained the same.

18                   At this time, was the FICO score

19   the same?  I'm just a little confused there, if

20   you could elaborate more on that.

21   A.      Certainly.  Again, if you recall, on

22   earlier questions, that this account was

23   purchased from household and that the conversion

24   was completed in April of 1999 or at least it

1    BY MR. KOSTOLAMPROS:

2    Q.      If we can just go down Exhibit 3.

3    "CPD," what does that stand for again?

4    A.      Cycles past due.

5    Q.      There was no past due on the account.

6            Then the Last Statement Balance

7    is zero there; is that correct?

8    A.      That is correct.

9    Q.      Do you know when the last time that card

10   was actually used?

11   A.      I do not.

12   Q.      Your records only go back to July 1999?

13   A.      That is correct.  We have a three-year

14   database.

15   Q.      The card was never used in July 1999,

16   August 1999, September 1999, October 1999?

17   A.      That is correct.

18   Q.      Was it ever used after October 1999?

19   A.      Quite frankly, I did not research that.

20           MR. KOSTOLAMPROS:  I would like

21           to mark this as Exhibit Number 4.

22           (At this point, the court

23           reporter marked the exhibit as Smaniotto

24           Exhibit 4).

1          the form.

2                    Are you asking him if he was

3          aware of that fact?

4    BY MR. KOSTOLAMPROS:

5    Q.      Are you aware of that fact?

6    A.      I have no knowledge of any testimony to

7    this point.

8    Q.      To your knowledge, did Fleet terminate

9    Mr. Brown's card based on any information

10   Experian provided to you?

11   A.      I'm unaware of that.  The letter would

12   indicate that it is based on inactivity.

13   Q.      Back to Exhibit Number 1, it says, "Our

14   decision was based in whole or in part on the

15   following information contained in your credit

16   bureau report."

17   A.      Yes.

18   Q.      You said that the majority of the

19   decision is based on the FICO score.  What other

20   factors do you take into account?

21   A.      In a generic sense, there are a

22   multitude of attributes that we take into

23   consideration.

24                   Unfortunately, in this case, in

1   Mr. Brown's case, with no activity on the

2   account and no internally-derived scores to act

3   on, we used the FICO score.

4   Q.       If Mr. Brown had activity on that

5   account, could you say that his line would have

6   been decreased?

7                   MR. SEMLER:  I object to the

8           form.

9                   You can answer it if you can.

10                  THE WITNESS:   I cannot state one

11          way or the other.  I would just say that

12          it would have been another piece of

13          information that would have been used in

14          that decision.

15  BY MR. KOSTOLAMPROS:

16  Q.       Just to reiterate, Fleet did not rely in

17  whole only upon Experian's-provided FICO score?

18                  MR. ZELOTES:  Objection.

19                  MR. SEMLER:  I object.

20  BY MR. KOSTOLAMPROS:

21  Q.       We are assuming that it is Experian that

22  provided that score?

23                  MR. SEMLER:  I object to the

24          form again.



46

1                   MR. ZELOTES:  I just want to

2             just ask a few follow-up questions.

3   BY MR. ZELOTES:

4   Q.        Do you have any reason to believe that

5   Fleet would list Experian as the source of the

6   FICO score if, in fact, it obtained that

7   information from TransUnion?

8   A.        There would be no reason to do that.

9   Q.        Are you aware of any instances where

10  Fleet has listed Experian as the source of a

11  FICO score in this or in any other report when,

12  in fact, the FICO score came from another credit

13  reporting agency such as TransUnion?

14  A.        Not to my knowledge.

15  Q.        If I could again refer you to Smaniotto

16  Exhibit Number 1, the Fleet letter dated October

17  6.             Do you know how soon that letter

18  would have issued after the determination

19  therein reflected?

20  A.        Generically speaking, the credit line

21  decreases, according to our processor, FDR,

22  they basically occur in the middle of the night;

23  so this would go out the following day of that.

24                  If it occurred at 1 o'clock in

# EXHIBIT C

9

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEWIS C. BROWN                    )
                                  )
                                  )
                     Plaintiff    )
                                  )    Case No. 3:01CV1967 (RNC)
vs.                               )
                                  )
EXPERIAN INFORMATION SOLUTIONS INC.    )
                                  )
                     Defendant    )
                                  )    April 13, 2004

## DECLARATION OF ZENAS ZELOTES ESQ. IN SUPPORT OF PLAINTIFF'S

## MOTION IN LIMINE TO DETERMINE

## ADMISSIBILITY OF FLEET'S DEPOSITION TESTIOMNY

I, Zenas Zelotes. pursuant to the provisions of 28 U.S.C. § 1746, state and declare under the pain and penalties of perjury as follows:

1.    I am counsel to the plaintiff and am fully aware of the facts and circumstances of this case.

2.    Lisa Balent, Esq. informs me that Fleet Credit Card Services L.P. (FCCS) has its sole and principal place of business in Horsham PA.

3.    On August 22, 2002, myself and defense counsel (George Kostolampros) deposed

1

Scott Smaniotto.

4.    The subpoenas attached as Exhibits D & E are true and correct copies of subpoenas that issued by my hand.

5.    instructed the deponent to make such persons available as might authenticate and affirm the truth of the assertions appearing in the (appended) October 6 letter. (Exhibit D).

6.    I have repeatedly conversed with in-house counsel at FCCS in an effort to discern whether Mr. Smaniotto might be produced voluntarily, to no avail.

7.    I have repeatedly endeavored to secure Experian's stipulation that Mr. Smaniotto is outside of the subpoena power, to no avail.

8.    FCCS In-house counsel informed me that Mr. Smaniotto resides in Maryland and works in Horsham PA.

9.    Upon discerning that Experian refused to stipulate to his unavailability (and the use of his deposition at trial), I served a subpoena directly upon FCCS' registered agent for service, attempting (in good faith) to exhaust all possible remedies.

Respectfully Submitted,

ZENAS ZELOTES, ESQ.
*Zenas Zelotes LLC* // Shaw's Cove 5, Suite 202 // New London CT 06320
Conn. Juris No. 419408 // Fed. Bar No. 23001 Tel: (860) 442-2265 // Fax: (860) 439-0295

2

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

Lewis C. Brown                          )
                                        )
                                        )
                         Plaintiff      )
                                        )    Case No. 3:01cv1967(RNC)
    v.                                  )
                                        )
Experian Information Solutions, Inc.    )
                                        )
                         Defendant      )
                                        )    August 21, 2002

## SUBPOENA

**TO:    Fleet Bank, N.A.  680 Blair Mill Road, Horsham PA 19044**

BY THE AUTHORITY OF THE UNITED STATES, and pursuant to Fed.R.Civ.P. 30, You are hereby commanded to participate in a corporate deposition to give testimony in the above-captioned matter, at the **Law Office of Francis and Mailman, P.C., 100 S. Broad Street, (Land Title Brilding; Tel: 215 735-8600), 19th Floor, Philadelphia PA, 19110, Noon, Tuesday, August 27, 2002**, to testify to what you know regarding the subjects herein referenced. The testimony shall be taken by stenographic means by Rubenstein and Associates, of 1518 Walnut Street, Ste. 1010, Philadelphia PA 19102.

Said deponent shall make available all persons as are necessary to:

Authenticate an October 6, 1999 letter, attached hereto as an Exhibit, and to affirm the truth of the assertions therein stated: more specifically, that Fleet lowered the Plaintiff's credit limit to $500 and that Fleet's decision was based, in whole or in part, upon the derogatory credit information therein referenced

Hereof fail not, under penalty of law in that case provided.

To any proper officer or indifferent person to serve and return.

Dated at Groton, Connecticut, this 1st day of August, 2002.

Zenas Zelotes
Commissioner of the United States Superior Court

## Certificate of Service

I hereby certify that a copy of the foregoing Subpoena to Fleet Bank, N.A., dated 8/21/02, was, on 8/21/02, served (certified return receipt) by the U.S Postal Service to:

Fleet Bank, N.A.
Attn: Lisa Balent, Esq. (Legal Dept.)
680 Blair Mill Road
Horsham PA 19044

and concurrently, via the U.S. Postal Service, upon

Jones, Day, Reavis & Pogue
Attn: George Kostolampros, Esq.
222 East 41st Street
New York, NY 10017

Date: 8/21/02

LEWIS C. BROWN, Plaintiff
ZENAS ZELOTES, ESQ.
His Attorney

By:
ZENAS ZELOTES, ESQ.
Consumer Law Office
of Zenas Zelotes, Esq.
753 Buddington Road
Groton CT 06320
Tel. (860) 448-6140
Fed. Bar No. 23001

 FLEET CREDIT CARD SERVICES
P.O. BOX 15810
WILMINGTON, DE 19886-5810

October 6, 1999

LEWIS C BROWN
PO BOX 286
ROWAYTON CT 06853-0286

||||....||.|.|.|.|.||.||....||.|.|.||.|.|.||.|.|.|.|

RE: 5491 0007 0579 8929

Dear Lewis C Brown,

At Fleet Bank, we make every attempt to meet our customers' credit needs. However, based upon a recent review of your financial profile, we have decided to decrease your credit limit to $500 effectively immediately.

Our decision was based in whole or in part on the following information contained in the your credit bureau report:

  SERIOUS DELINQUENCY, DEROGATORY PUBLIC RECORD, OR COLLECTION
  AMOUNT PAST DUE ON ACCOUNTS
  TIME SINCE DELINQUENCY TOO RECENT OR UNKNOWN
  TOTAL BALANCES TO CREDIT LINES IS TOO HIGH ON REVOLVING

You may contact the credit bureau directly at:

  EXPERIAN
  701 EXPERIAN PARKWAY
  PO BOX 2002
  ALLEN, TX  75013-0036
  588-397-3742

The reporting agency played no part in these changes and cannot supply specific reasons for such. You have a right to a free copy of your report from the credit reporting agency listed above if you request such information within 60 days of receiving this notice. If information in your report is inaccurate or incomplete, you may dispute the matter with the reporting agency.

Please note that the terms and conditions specified in your Cardholder Agreement still apply to your account.

Should you have any questions concerning this matter, please call us at this toll-free 1-800-882-2735.

Sincerely,

Fleet Credit Card Service

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age [provided that the applicant has the capacity to enter into a binding contract]; because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is The Office of the Comptroller of the Currency.Customer Assistance Unit, 1301 McKinney Ave., Suite 3710, Houston, Texas 77010.

---- ---- 5749 7547 5077 0579 5B0028048

# EXHIBIT E

11

 Fleet

680 Blair Mill Road
Horsham, PA 19044

July 23, 2002

Zenas Zelores, Esq.
753 Buddington Rd.
Groton, CT 06340

Re: Lewis Brown

Dear Mr. Zelores:

I am responding as the Custodian of Records of Fleet Credit Card Services, L.P.
("Fleet").

Please be advised that all information obtained by Fleet regarding a customer's credit
history is accessed electronically, and no hard copy records are kept or obtained in the
regular course of business. Accordingly, Fleet is unable to comply with your request.

If you have any further questions, please feel free to contact me at 1-800-262-7158,
extension 7526.

Sincerely,

*Gabriel Gallagher*

Gabriel Gallagher
Custodian of Records
Credit Card Division

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT

———————————————— DISTRICT OF ————————————————

Lewis C. Brown

### SUBPOENA IN A CIVIL CASE

V.

CASE NUMBER:[1]

Experian Information Solutions Inc.

3:01cv1967(RNC)

TO:  Fleet Bank, N.A.
71 Town Street
Norwich CT 06360

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Any and all documents relating to the plaintiff's Fleet credit card account (# 5491 0007 0579 8929), to include, without limitation, any and all information obtained from, or being, the plaintiff's credit report, and any and all identifying information Fleet ever used to identify the plaintiff when requesting his Experian credit report in 1999.

| PLACE | DATE AND TIME |
|---|---|
| Consumer Law Office of Zenas Zelotes, Esq.<br>753 Buddington Road, Groton CT 06340 | June 26, 2002., 2 p.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLANTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Plaintiff | June 14, 2002 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Zenas Zelotes, Esq. 753 Buddington Road, Groton CT 06340 (860) 443-6140

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | June 14, 2002 | Fleet Bank, N.A.<br>71 Town Street, Norwich CT 06360 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Diana George (for Fleet Bank, N.A.) | Certified Mail; Restricted Delivery; Return Receipt |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Zenas Zelotes, Esq. | Attorney for Plaintiff |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____ June 14, 2002 _____
DATE

_____
SIGNATURE OF SERVER

753 Buddington Road
ADDRESS OF SERVER

Groton CT 06340

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

*Zenas Zelotes LLC*
Shaw's Cove 5, Suite 202
Tel. (860) 442-2265 / Fax. (860) 439-0295

COMMERCIAL LITIGATION & PLANNING

Jones Day
Attn: Arun Chandra
222 E/ 41st Street
New York NY 11017          4/14/04

*Zenas Zelotes LLC*
Shaw's Cove 5, Suite 202
Tel. (860) 442-2265 / Fax. (860) 439-0295

COMMERCIAL LITIGATION & PLANNING

United States District Court
Attn: Clerk of Court
450 Main Street
Hartford CT 06103          4/14/04

*Zenas Zelotes LLC*
Shaw's Cove 5, Suite 202
Tel. (860) 442-2265 / Fax. (860) 439-0295

COMMERCIAL LITIGATION & PLANNING

United States District Court
Attn: Chambers (Chatigny J.) (C. Copy)
450 Main Street
Hartford CT 06103          4/14/04

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that a copy of the document(s) attached was served upon each addressee IN HAND on the date(s) reflected.

4/14/04

ZENAS ZELOTES, ESQ.
*Zenas Zelotes LLC*
Shaw's Cove 5, Suite 202
New London CT 06320
Conn. Juris No. 419408 // Fed. Bar No. 23001
Tel: (860) 442-2265 // Fax: (860) 439-0295